Thank you and be seated. We're ready to hear argument in the United States v. Perry. Mr. Pope. Thank you, Your Honor. May it please the Court, Virginia's Medicaid program provides qualified patients may receive both personal and respite in-home care. Personal care includes services to assist frail and disabled patients with everyday activities, such as eating, bathing, and doing chores around the home. Respite care involves the same services and is a benefit for patients with unpaid caregivers that is provided due to the absence of or need for relief of those unpaid caregivers. Personal care and respite care are both defined by regulations found in Virginia's Administrative Code. In its zeal to convict Wayne and Angela Perry, the government introduced, in this case, false evidence regarding the regulatory criteria for receiving respite care and crafted its theory of respite care fraud around these false requirements. Specifically, to establish its respite care fraud theory, the government This would only go to the charges that address respite care. Yes, Your Honor. The others are not covered at all by these false statements. Correct, Your Honor. It would be counts 1, 2 through 5, and 10 through 13. Those would be the counts that would be Is this your regulatory argument? This is false evidence, and it does dovetail into the regulatory argument, Your Honor. But principally, right now, it's the NAPOI argument. False evidence is the regulations that have expired. Is that it? There was an in-home requirement that had expired, but there was also the claim that only the primary caregiver could request the care, which is found nowhere in the regulations. But you all made the same mistake about at least one of those, didn't you? Well, Your Honor, that's very important. That really is a red herring, Your Honor. For purposes of NAPOI, it does not matter that one side had made the same mistake and had made and failed to uncover the falsity, because as in Burger v. United States, the Supreme Court made plain that the government has a special duty to assure the accuracy of its representations. I thought the government argued that defendants could not be convicted for violating any of the Medicaid regulations, and the district court gave specific charges to that. Your Honor, those instructions do not matter in this case. Your Honor, what happened with the NAPOI violation is so fundamental to the truth-seeking function of the court and to the truth-seeking function of the trial, and goes to that very core, that there's no instruction that can cure that. And as to the regulatory issue, United States v. Wolf dealt with that very same issue, where the government had requested a limited instruction because they had asked for that instruction because most of the regulation had formed a large portion of their health care fraud theory, or in that case it was banking fraud, excuse me. And the court in United States v. Wolf said, where the regulation forms a key part of the government's theory of guilt, a limiting instruction absolutely cannot cure the harm. I thought the government's theory was not that the wrong person was asking for this that nobody asked for, that the hours that were billed were hours that were never requested by anybody. They were falsified. No, Your Honor. The respite care theory that forms the basis of counts 2 through 5 and 10 through 13, and the government explains this in their brief, is that it was because that the care that was actually provided was not provided for the benefit of the primary caregiver. That was their argument. The hours that were worked, and that's very important to note, the hours here were actually worked. They were actually worked. The whole purpose was that... Well, some were and some weren't. That is true. But there were two theories that founded the respite care issue. The primary theory, Your Honor, was based on hours that were worked that did not fall within the prerequisites of the Medicaid regulations. It was a Medicaid regulatory violation, if at all, based on these vague regulations. It was not a crime, Your Honor. But doesn't there have to be somebody who's getting relieved under respite care? Isn't that the whole point of respite care is to give the caregiver some relief? No, Your Honor. Then the only authority, the only case that's ever considered this was Benjamin H.V. Old. And in that case, the court said that respite care nears both to the benefit of the patient and the caregiver. No, I understand that. But you're saying so a patient who has no helper giving any kind of caregiving can ask for respite care? Yes, Your Honor. Not to relieve any other person who's helping, but just additional care? Absolutely, Your Honor. And that would be respite care? Well, one of the regulations, it says in the absence of a caregiver, in the absence of an unpaid caregiver, the care can be provided. What regulation is that, do you know? That is 12 V.A.C. Section 30-120-766, which is the regulation that defines respite care. And I'll note, if you look at page 6. . . Does that require a caregiver that's paid? An unpaid. . . I mean, how could there be respite care if there's no caregiver at all? There has to qualify under the program. The nurse that does the evaluation has to find that the patient has a primary caregiver. That's at the very threshold to qualify for the program. All of these patients had qualified under the program. And what had happened was the patients themselves had requested the care, and the care was actually provided. The only reason that it was fraud was because . . . I'm getting confused in answering. I just want to make sure I understand your answer to Judge Angel's question. Yes, Your Honor. If you don't have a caregiver, who's getting the respite? There is a primary caregiver that is provided. There has to be a listed primary caregiver before the patient can ever even qualify for respite care hours. You represent Wayne Parrish, is that right? Correct. And he did testify to that fact that you had to have a primary caregiver and that the respite was there to provide relief for the caregiver. Your Honor, respectfully, that was a mistake of fact on his part. The regulations do not require this. I mean, that is the point. I understand that point, but that goes to an even greater issue, and that is to the extent that, well, if he said this, is that in itself in the Fourth Circuit law a waiver of any allegation, a false testimony? He gets up and testifies to the very same thing in his Fourth Circuit case law that says a defendant can waive a false fact in an instance, and he or he makes this very statement himself on the stand.  Absolutely not, Your Honor. The government had the responsibility, and that is the point. That is the point of Nathway B. Berger. The United States has the absolute obligation to get it right. It has the obligation to get it right. It has the obligation to convict and to prosecute based on correct evidence and correct law. What is the effect of the Menster case in the Fourth Circuit that deals with false testimony, in which the defendant does get on it on the stand and says this very same thing? And this Court says, well, that's a waiver. Your Honor, this is a fundamental Nathway issue, Your Honor, where there was false evidence that was proffered by the government. This is categorically distinct. This is a due process violation that, as Aguirre said, that involves the corruption, the very corruption of the truth-seeking function of the trial process. It was a statement that was made. Apparently it doesn't seem to have been intentional. I don't think that allegation is here. But this happens all the time in a trial. It's called inconsistent testimony, and sometimes defense counsel is very happy to get it because what happens on cross-examination is you get up and challenge the credibility of the witness because you point out that's not the case. This is what really the regulation says, and you don't know this. Your Honor, this is fundamentally different. This is a due process violation in which the government sponsored false evidence regarding regulatory requirements and based its conviction. You had two nurses to take the stand, and they told you what the deal was. They said, yeah, they told you the correct law. So you all noticed this, and all you had to do to go to a public record as a That's not the standard, Your Honor. Absolutely not the standard. But it certainly has to have some standard in terms of the representation of the client. If someone gets on the stand and makes a false statement that you allege is false or give inaccurate information in terms of a date that something is effective and whether it's been a repeal, that every case like that, we don't just throw it out because there's a false statement. That's part of the trial process is that a witness, every witness that gets up and says something that's incorrect, technically that's a false statement. But there's a difference between a false statement that's made deliberately with the intent and knowing that it's happening, but when the defendant also has the same kind of knowledge that's here, that's kind of putting it, maybe someone didn't do their homework on this because this is not hard to find. You just have to go to the record, the public record, and it shows this fact exists. And that would have been wonderful fodder for a great cross-examination, close an argument, and to challenge the credibility of witnesses. This is categorically distinct. This is, and Ross V. Hain of Seventh Circuit Decision stated that violations under NAPU and Giglio, they may be waived only when there is evidence of actual knowledge that the government has offered false and misleading evidence and chooses not to raise the objection before the district court. This is Ross V. Hain, 638 F Seconds, Seventh Circuit case. How about the Fourth Circuit? And also, This is what I want you to address because that's the one to say that they had prior knowledge that the testimony was false. United States v. Minster, 619 F Second, 1041, which also included in a 28-J letter. The court said it found waiver, essentially it applied the same reasoning of Ross V. Hain. It implied a fine waiver of the NAPU and Giglio claim, where defense counsel knew, the record showed the counsel knew of improper evidence, but did not raise issue with the trial court. What better evidence than when the defendant gets up and says the same thing himself? You know, you either know or you don't know. I mean, it's kind of what you do, and you get up and make this testimony that matches what the government just said up there. You got to know. Well, the United States Supreme Court, Your Honor, disagrees with that. The United States Supreme Court makes plain that the burden falls squarely on the government. Has the United States Supreme Court addressed that issue? It has addressed it. It hasn't made it very plain to me. Your Honor, I believe reading of Berger v. United States, reading Napue, reading Agars, and reading a host of other cases from the Supreme Court, I believe that comes out clearly. Even in Giglio, even in Giglio, the government was there. It was determined that even where the government intentionally or negligently made the representation. Well, what's your best Napue case where the government and the defendant both proceed under a mistake? You know, there's no case, no Napue case specifically, that addresses this particular situation. But Napue does. It's interesting. In Napue, the mistake there, the defense counsel had actually raised an issue that was raised a question regarding the benefit that the individual had received. So, the defense counsel had actually on cross-examination had actually gotten evidence regarding the witness' receipt of a benefit. But the Supreme Court said, no, that's not enough. The point is, essentially, that's irrelevant. The point is, was that the government had introduced false evidence. That was the point. Does it make a difference if the defendant, upon hearing this false evidence, either no or there's some indication they should know that it's false? And that comes very clear to me in the argument, the closing argument of the defense counsel, who points out there's some conflicting evidence. He's talking about those nurses and this other information here that's very material. And all you've got to do is go look at a public record and you can determine which one is the one. But, I mean, does that make a difference that the defense counsel gets up, make a closing argument, and says the evidence is unclear as to the date this regulation was in effect? That's in the closing argument. Doesn't that show that they either knew or should have known or done something? Your Honor. Other than just to wait until you come to us and say, false testimony, false testimony. You knew this. You knew something was going on. And if you knew it was conflicting then, to find that information out cannot be something that's secretive. If this is so material that you are on notice that there's a conflicting date here, there's got to be some duty to go and look at the answer because that answer is going to inform the outcome. But defense counsel didn't know. But they argued that. They argued that it was unclear that the date of the regulation was in effect. Your Honor, the point is, the absolute fundamental point here is, is that the government proffered false evidence. I'm with that point. And I don't want to debate that point. I mean, if we can accept that point, my point is on the defendant's perspective, that if you know or should know this, and this is very important. This isn't just whether he walked in the door or walked out. This is on point of some of the charges there. And you know, there's this conflicting evidence there. And if it's going in this direction, it's going to help you. That regulation is not somewhere secret. It's a public document. Go look at it. But don't, I mean, but to not look at it, if, if, if, if we go in the direction of going base, we'll say, don't look at it in regulations. Wait till you get to the fourth circuit and just say, that's false. Get rid of all of it. Well, very briefly, Mr. Pope. Oh, your honor. Again, I will, I will note that the burden is placed, not on the defendant. The burden is placed on the government. That, that is what, that is what the case law indicates. And I'll say the remainder of my time for rebuttal. Thank you very much, Mr. Sacks. We'll be glad to hear from you. May it please the court, Andrew Sacks here for co-defendant, Angela Perry. Good morning, your honors. In addition to joining the arguments that have been offered in the brief on behalf of Wayne Perry and Orly. Wasn't there an older Andrew Sacks at some point in time, back when I was in the Navy, I knew some Sacks. Are you of that? I am. I am one of them. Okay. That would be my father, Stanley too. Let me ask you a question with regard to your client. You represent Mrs. Perry. I do. And as to Wayne Perry, there's a post-trial motion that includes this issue, but it doesn't include Mrs. Perry. Right. So is our review insofar as her on this false testimony on a plain error? It would be, your honor. I think so. Yes. The, the specifics that we raised on Angela Perry, your honor, which are in the brief at page 53 to 54 that we think are the most pertinent with respect to her, are that on counts 2 through 13 and 15 through 18, which are the substantive counts other than count 14, were specific identifiable, involved specific identifiable Medicaid recipients identified by initials whose files were the specific subject of the particular count under consideration on a specific alleged date. And our position is that the record is just devoid of any specific evidence connecting or tying Mrs. Perry specifically to the offense conduct as to the specific identifiable file in each count of conviction on each of the alleged dates of the offense conduct. There were a number of, you'll see there are, there are charts, there are dates, there are initials, but, and while there was general testimony that Mrs. Perry was aware of Mr. Perry's general activities regarding fraudulent billing, not a single witness or a single document identified Mrs. Perry as having been specifically involved with any of the specifically identified files under any of the counts on the occasions in question. That's the fundamental flaw. Is your argument that the evidence is insufficient because there's no direct testimony that on a particular day Mrs. Perry directed a particular employee to alter a record with respect to a particular patient as opposed to general testimony of the overall plan to do so? Yes. That's correct, Your Honor. And while general testimony may be sufficient for the conspiracy count under count one, it's very different when we get to the substantive counts. Those were very discrete, individual identified acts, and you cannot make the leap from general testimony and say, well, because we think she was involved in some of these things, therefore she must have done these things. They have to be established by evidence. Address the, address the, at least the proposition that perhaps she was found guilty because these are acts of co-conspirators in furtherance of the conspiracy. Well, that might be sufficient, Your Honor, for the conspiracy, as I say. That might support the conspiracy and bring her in with respect to the scope of the activities of the conspiracy, but I believe there is a difference. I see my time is out, but if I may finish the question. Please finish. Yeah. I believe that when you get down to a specific substantive count with a specific activity, that there has to be sufficient proof to support that specific charge, not just some general, well, they were foreseeable as part of a conspiracy. I think that's a different standard for the conspiracy than it would be for the individual counts, and I think it's particularly important in counts 15 and 18 because those are the aggravated identity theft counts, and those carry a mandatory minimum two-year sentence, and I don't think this defendant's guilt on that charge was established sufficiently to specifically hold her to that offense. Thank you very much. Thank you very much. Good to see you all again. Mr. Salisbury. Thank you, Your Honor. Your Honor, this court has stated that a trial court should exercise its discretion to grant a new trial sparingly, and regarding the Medicaid regulation issue, based on its careful analysis of that issue in its memorandum opinion, the district court did not abuse its discretion in denying the motion for a new trial. In fact, it said specifically the court concludes beyond a reasonable doubt that the party's joint error as to when the regulation changed, a change that defendant himself was admittedly aware of, did not contribute to the verdict obtained. The defendants were never charged with violating a regulation but with violating federal criminal law, and this was emphasized to the jury both by the government and the trial judge. The jury was told by the government in the government's closing, quote, and let's be very, very clear here, Wayne and Angela Perry are not on trial because they violated Medicaid regulations. And again in rebuttal, the government told the jury, Angela Perry and Wayne Perry are not charged in the superseding indictment with violating Medicaid regulations. And what's more, the court specifically instructed the jury to that effect, and that is important because this court has held on numerous occasions that a jury is presumed to follow the court's proper instructions, and it was a proper instruction. You heard Judge Agee ask Mr. Pope that very question in terms of the Medicaid regulation. You heard the response. Respond. Well, Your Honor, I'll say this. The government's theory of fraud was not based on that residency regulation. If that had been the case, the government's only question to the witnesses who testified they never received respite care, some of them said we didn't know what it was. We never provided any care for our patient, our relative, our mother, our father. We never provided any care. In fact, we had no contact with this home health care service. If the government's theory of fraud was predicated on the residency requirement, our only question to those witnesses would have been, did you live with your mother and father during this time period? But that wasn't the case. We went into, did you get respite care? Were you afforded relief? And witness after witness said no. That question was asked, though, to some of the witnesses. It wasn't the exclusive question, but some of the witnesses were asked that question. They were asked that to establish that they did not receive respite because they needed no respite. They needed no relief because they didn't provide care. And to the extent some of them lived out of town, that emphasized that point. We didn't provide care. We didn't even live in town. But it wasn't based on the residency requirement, the government's theory of fraud, but on the fact they never got any care. Opposing counsel, I'm not quite sure what opposing counsel's response was, but what I took it to be was that the Virginia regulations did not require that the caregiver need respite in order for respite care to be provided. I may have gotten that wrong, but I was somewhat confused. Can you explain your view of that? Well, it's difficult for me to understand that position, Your Honor, because it's respite. It provides respite to the primary caregiver. All the witnesses testified respite care is not a basis to give overtime work to a personal care aide. It means what it says. It's respite. And that's a new theory to me because every witness in the trial testified, and as well the Medicaid manual, that respite care is to provide respite to the primary caregiver. It even gives a number of hours. It's like a doctor who orders a CT scan when it's not needed, that kind of thing. Somewhat similar to that. It had been 720 hours a fiscal year that a primary caregiver could receive respite. Then it was reduced to 480. But it's totally different from personal care, which is assisting a patient in the acts of daily living. And we proved, beyond a reasonable doubt, that respite care simply wasn't provided, yet it was billed for. Now, with respect to the Meinster case, it's interesting because in their 28J letter, the defense relies on that. But really, Meinster undermines their argument because in Meinster, the facts regarded an undisclosed deal with one of the government's witnesses. He was also being prosecuted in another district. That district had said it would bring to the attention of, I think, North Carolina, any cooperation it received. The North Carolina U.S. Attorney's Office didn't give that agreement or disclose that agreement to defense counsel, but defense counsel knew of it. They knew of it, if you look at the opinion. And the court stated that the defense waived it by waiting until the Rule 33 motion to bring the issue to the attention of the trial court. And we have something analogous here. If you look at the proposed jury instructions, some of them, by the defense, and they're at pages 4419 to 4423 of the appendix, those jury instructions show at the bottom, supporting authority of the Virginia Administrative Code. And one of those instructions actually includes the section from the Virginia Administrative Code that eliminated the residency requirement. So at the very least, the defense had constructive knowledge that the residency requirement had been eliminated. In fact, it's interesting that they withdrew those proposed instructions when the trial court said, well, how about if I adopt the government's instruction and tell the jury the defendants are not on trial for the violation of any regulation? They withdrew those proposed instructions. But if you look at the supporting authority for those instructions, they referenced the Virginia Administrative Code. So either they had actual or certainly constructive knowledge that the residency requirement had been eliminated, and yet they elected not to bring that issue to the attention of the court until they filed the Rule 33 motion. There are two parts to the regulation, right? There's a residency part, and then there's a part as to who can request respite. That's correct. Do you agree that both of those were incorrect during the trial? There seems to be some confusion about the second one. There was a statement made during the trial by one of the witnesses, and it may have been a government witness, that only the primary caregiver can request respite care, and apparently anyone can request it. It's immaterial for several reasons. Number one, that wasn't even brought to the attention of the trial court. The first time that issue's been raised is on appeal in the appellant's brief. But moreover, it's immaterial because it wouldn't have mattered in this case because no one requested it. There was no respite care given. So who may have requested it just isn't significant in this case. No one requested it. There was no respite care provided. I don't know if the court wants me to address the jury instruction issue on willfulness or any other issue. That's up to you. You might address Mr. Sachs' arguments about Mrs. Perry since he did raise those. Well, the evidence was overwhelming that Mrs. Perry knew that with respect to personal care, the company was billing on the basis of the maximum hours permissible under the nurse-approved plan of care and not the actual hours worked. She absolutely knew it. We have those references in our brief and in the appendix. And Mr. Sachs is wrong on Pinkerton liability. Pinkerton liability doesn't go to the conspiracy. It goes to substantive crimes committed during the course of a conspiracy by a co-conspirator in furtherance of the conspiracy and as a reasonable, foreseeable consequence of the conspiracy. So when the conspiracy is to fraudulently bill Medicaid, and in fact those are done in the discreet counts that we charge as false statements, she's liable under Pinkerton liability, agency liability, and ADA and ABETA liability. She's guilty of all the counts. So this would be overt acts in furtherance of the conspiracy that prove the substantive crimes. Correct, Your Honor. Thank you, Your Honor. Thank you very much. Mr. Pope, you've got some time on rebuttal. Two quick points just to go back about the respite care, and then I'll also address the sufficiency of the evidence issue. The government said here that there was no respite care provided. That's absolutely not so. There was respite care that was provided for these patients. And as I said, in Benjamin H., the respite care can be provided for the benefit of the caregiver and for the patient. So there was care actually provided. The only reason that it was not, quote-unquote, provided was because of the regulation, because it didn't fall within the regulation. Second of all, the government said that one of its wouldn't. What about the evidence of the testimony where they would use phrases like run the respite and that sort of thing? I thought there was evidence that there were instances where there was care billed as respite care that was not given. There were those instances, Your Honor. So let me be clear. There were two types of respite care fraud that the government was arguing. There was what I would call the classic Medicaid fraud, which is that type where the hours are padded that are never provided, and that was definitely proven, and that's not the issue here. What we are saying here, and the padding, though, was done by, and the evidence showed that the padding of hours was done by Bernice Spain, Serena Freeman, and Renita Jones, independent from Mr. Perry. This was a separate and independent conspiracy that was happening within CPC. That was where the padded hours and the made-up timesheets came from. The proof showed that what the Perrys were actually allegedly guilty of. Wouldn't that be a jury argument, though, a way-to-the-evidence type argument? Your Honor, it would be a legal argument as to the theory because one theory is actually legally insufficient. The legally insufficient theory is the theory that says that the hours that were actually provided did not fall within the framework or within the definition of respite care. I thought there was evidence, though, and I think it was Dee Lindsey, that somewhere toward the end of the week for billing that she said she was instructed that she had already prepared the bills, but now she needs to get another $40,000, something like that, so that it was obvious that that would be a time when you can't really do the work. The only way you're going to get that money on the bill is to pad the timesheets, and that that instruction came, I thought, is that a woman, Dee Lindsey, that testified that Angela Perry had said to do that? I do recall that testimony, Your Honor. Doesn't that provide proof that the Perrys were aware that they were instructing people to pad these respite hours? It wasn't a question of whether the work was actually done there. It couldn't have been done. There wasn't enough time to do the work. As to that alternative theory for counts 2 through 5 and for 10 through 13, yes, Your Honor. But also in those particular counts, 2 through 5 and 10 through 13, there was also an issue, that alternative theory, that regulatory violation theory, where, as you pointed out, Your Honor, where there was also that requirement that only the primary caregiver could provide. And the government said here that only one government witness made that statement? Are there separate sets of damages under that theory? That was an alternative theory that was provided to the jury, Your Honor. And the government said only one witness? Your Honor, in opening statement, the government said primary caregiver must live in the home. But here's the real key. The only person who can request respite care is the primary caregiver. That's JA-7779. The government's very first witness, a Medicaid expert, primary caregiver must make the request. The primary caregiver must live in the residence. That's JA-122. Did the government not put on evidence, nevertheless, that nobody requested it? Not only was it not that person, but nobody requested it. The patient requested it. The evidence showed that the patients requested it. The patients had requested the respite. What the evidence showed was that persons from CPC, and this was the whole idea of run the respite, and this is what the evidence showed, that the run the respite meant for aides and for staffing coordinators to call patients and tell them, and by the way, in accordance with Medicaid regulations, they called the patients and they said, Patient X, you have 200 hours of respite care left. Do you want to work any of these hours? And the patient would say yes. And those hours would actually be worked. The only reason that it was fraud, in the government's theory, was because it wasn't the patient, it was not the primary caregiver that requested it. And that was also made clear by the FBI witness who testified. Under applicable Medicaid regulations, if no primary caregiver lived in the home and there's not a primary caregiver, quote, that has requested respite, the hours billed are fraud. JA 1454. Do we have to accept your position that if there's no caregiver, in any event, who needs respite, that still you can have a request for respite care from the patient? Your Honor. In order to agree with your argument? Your Honor, if you look at... Can you answer that and then explain it? Your Honor, if you look at the vagueness of these regulations, 12 VA Virginia Administrative Code Section 3120, the conditions for receiving respite care, look specifically at 766A2, respite care hours benefit for the recipient and unpaid caregivers because of the absence of the caregiver or the need for relief of those unpaid persons who routinely provide the care. So in other words... There has to be a caregiver. There has to be a primary caregiver in order to ever even be eligible to receive the program. And there's no dispute that all of these persons were actually eligible under the Medicaid program. That's why they qualified for hours, for respite care hours. So there was a caregiver. There was a caregiver there. And the regulation, the text of the regulation says, it says, in the absence of the caregiver or need for relief of the caregiver. So it's phrased in the disjunctive. The government cuts out that first part and says it's only for need for relief of the unpaid caregiver. But notably on brief, they try to make an explanation for that. If you look at page six, they add the term emergency absence of the caregiver. That doesn't appear anywhere in the regulation. Nowhere. But yet... Mr. Pope, your time has expired. Is there anything else very quickly you want to tell us in closing? All I would say is that what happened below was a clear violation of due process, and the convictions on counts 1, 2 through 5, 10 through 13, and 15 through 18 should be reversed. Thank you very much. Appreciate your time. We note that both you, Mr. Pope, and you, Mr. Sachs, are court-appointed, and the court wants to express its appreciation to both of you for undertaking the representation, and in this case, the very excellent work you've done. So we will come down and greet counsel and then move on to our last case.
judges: G. Steven Agee, James A. Wynn, Jr., Thomas D. Schroeder